UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRITTANY B.,

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

CASE NO. 2:24-cv-02171-BAT

**ORDER REVERSING AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS**

The parties agree this matter should be remanded but disagree about whether the remand should be for further administrative proceedings or an award of benefits. Dkts. 9, 15, 16. The ALJ did not adequately address plaintiff's claim and theory of the case: her epileptic seizures meant her condition met or equaled Listing 11.02 and, alternatively, regular seizures and other non-exertional limitations rendered her unable to work fulltime. Tr. 41–42. The ALJ also ignored two of three opinions by her longtime treating epilepsy specialist, inadequately reviewed conflicting medical evidence, and summarily rejected plaintiff's subjective complaints. Nonetheless, the Court finds further administrative proceedings are necessary and would be useful to develop the record and to determine whether plaintiff's epilepsy meets or equals Listing 11.02 or, alternatively, whether her seizures, their sequelae, and other non-exertional limitations might render her disabled. The Court therefore **REVERSES** the Commissioner's final decision

ORDER REVERSING AND REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS - 1

and **REMANDS** the matter for further administrative proceedings under sentence four of 42
U.S.C. § 405(g).

## DISCUSSION

Under the Social Security Act, "courts are empowered to affirm, modify, or reverse a
decision by the Commissioner '*with* or *without* remanding the cause for a rehearing.'" *Garrison
v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014) (emphasis in original) (quoting 42 U.S.C. §
405(g)). Although a court should generally remand to the agency for additional investigation or
explanation, a court has discretion to remand for immediate payment of benefits. *Treichler v.
Commissioner of Social Sec. Admin.*, 775 F.3d 1090, 1099–1100 (9th Cir. 2014). Under the
Ninth Circuit's credit-as-true rule, three elements must be satisfied in order for a court to remand
to an ALJ with instructions to calculate and award benefits: (1) the record has been fully
developed and further administrative proceedings would serve no useful purpose; (2) the ALJ
has failed to provide legally sufficient reasons for rejecting evidence, whether claimant
testimony or medical opinion; and (3) if the improperly discredited evidence were credited as
true, the ALJ would be required to find the claimant disabled on remand. *Garrison*, 759 F.3d at
1020. Nonetheless, when a claimant is otherwise entitled to an immediate award of benefits
under the credit-as-true analysis, the Court has flexibility to remand for further proceedings
"when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled
within the meaning of the Social Security Act." *Id.* at 1021.

Plaintiff contends she has satisfied all three elements of the credit-as-true standard such
that the Court should exercise its discretion to remand plaintiff's claims for an award of benefits.
The Court finds the record is not fully developed such that further administrative proceedings
would be useful, and that conflicting evidence that has yet to be meaningfully examined may or

may not demonstrate that plaintiff's epilepsy meets or equals Listing 11.02, or that plaintiff's

epilepsy and other severe impairments render her unable to work fulltime.

### 1. Inadequate Examination of Listing 11.02

Plaintiff's primary contention is her epilepsy meets or equals Listing 11.02 (Epilepsy).

The entirety of the ALJ's evaluation of plaintiff's epilepsy not meeting or equaling the listing

was: "The undersigned considered physical listing 11.02 and Social Security Ruling 19-2p." Tr.

20. That explanation was unsupported by substantial evidence.

Plaintiff contends that her epilepsy meets or equals type A or type B of Listing 11.02:

> **11.02 Epilepsy, documented by a detailed description of a
> typical seizure and characterized by A, B, C, or D:**
>
> A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at
> least once a month for at least 3 consecutive months (see 11.00H4)
> despite adherence to prescribed treatment (see 11.00C).
>
> OR
>
> B. Dyscognitive seizures (see 11.00H1b), occurring at least once a
> week for at least 3 consecutive months (see 11.00H4) despite
> adherence to prescribed treatment (see 11.00C).

20 C.F.R. Pt. 404, Subpart P, App. 1, § 11.02. As support, plaintiff notes she suffers from six

types of seizures. Dkt. 9, at 4–5; *see, e.g.*, Tr. 642–43.[1] Plaintiff argues she met Listing 11.02A

---

[1] In April 2022, nurse practitioner Hannah Rockett described **six types of seizures**: **(1) focal aware ("FA")**—déjà vu with tingling (rare); **(2) focal impaired awareness ("FIA")**—eyes closed, appears frightened, crying, hyperventilation, tachycardia, partially responsive, 5–12 minutes in duration (captured in video EEG in November 2021, but none since that date); **(3)** convulsions—abrupt loss of consciousness, full body shaking, lips turning blue, 2–3 minutes (3–4 during lifetime, last in April 2020); **(4) FIA becoming focal bilateral tonic clonic ("FBTC")**—tingling sensation, vertigo, head bobbing with maintained awareness, unable to control body movements, loss of vision in lateral left eye, progresses to right head deviation, mild rhythmic jerking lasting 1–2 minutes (onset in April 2021, increased to 1–2 per month until stopping in December 2021); **(5) new seizure type as of December 24, 2021, possibly myoclonus**—no warning, body stars jerking, maintained awareness, able to talk, understand

as of September 2021 because there are reports of seizures that could be characterized as a general tonic-clonic ("GTC") in July, August, and September of 2021. Dkt. 9, at 5 (citing Tr. 370, 377–81, 386, 388, 393, 504, 510, 623). Plaintiff argues she met Listing 11.02B as of July 1, 2021, based on the November 2021 opinion of her treating specialist in epilepsy Mark D. Holmes, M.D. Dkt. 9, at 5–6 (citing Tr. 493). In fact, in his November 2021 opinion—an opinion ignored entirely by the ALJ—Dr. Holmes concluded plaintiff had tonic-clonic seizures at least once a month for at least three consecutive months, thereby possibly meeting the Listing 11.02A criteria, and had dyscognitive seizures at least once a week for at least three consecutive months, thereby meeting the Listing 11.02B criteria. Tr. 493.

There is no justification for the ALJ to have failed to discuss any of the evidence that plaintiff's epilepsy met or equaled Listing 11.02. On the current record, however, a question of fact remains as to whether plaintiff has demonstrated having met or equaled Listing 11.02A or 11.02B regardless of Dr. Holmes's conclusory statements in support of the proposition. Although Dr. Holmes stated the 11.02A-type seizures occurred monthly and the 11.02B-type seizures occurred weekly, he did not refer to any medical notes or plaintiff's seizure logs to support which type occurred when. Tr. 343. Within the medical notes cited by plaintiff, it is unclear which of the seizures qualify for category A (GTC seizures) or category B (dyscognitive seizures). For example, medical notes refer to monthly seizures that involve no loss of consciousness that would not qualify as GTC seizures. *See, e.g.*, Tr. 370. Even when the seizures involved loss of consciousness, although Dr. Holmes refers to monthly "tonic clonic" seizures, Tr. 343, the listing refers to *generalized* tonic clonic seizures, while the Type 4 seizures that

---

speech, felt "loopy," clustering over 5 minutes (2–3 times per week); and (6) childhood seizures—zoning out, unresponsiveness, chewing, clicking noises, hand fidgeting, mild stiffening, wandering, collapse, and urinary incontinence. Tr. 642–43.

ORDER REVERSING AND REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS - 4

1    plaintiff described as occurring monthly may have been focal impaired seizures becoming *focal*

2    *bilateral* tonic clonic, Tr. 643; *see* Tr. 504; *see also* "Tonic-Clonic (Grand Mal) Seizure,"

3    https://my.clevelandclinic.org/health/diseases/22788-tonic-clonic-grand-mal-seizure

4    (distinguishing between the two types of tonic-clonic seizures) (last accessed Sept. 10, 2025).

5    Moreover, plaintiff experienced numerous seizures that disclosed no changes in EEG, with the

6    clinician noting "[t]his EEG captured numerous nonepileptic episodes," Tr. 729, such that further

7    supplementation of the record would help to clarify which seizures and at what frequency satisfy

8    Listing 11.02A, Listing 11.02B, or neither. *See, e.g.*, Tr. 747 ("Remains unclear whether these

9    episodes are non-epileptic or SPS in nature [not captured on EEG despite broad electrode

10   coverage].")); 750 ("Of note, she had a 'seizure' during clinic visit, in which she had shaking and

11   twitching of her left arm, head and trunk was witnessed. She had no impairment of

12   consciousness, but did use an intranasal drug. Phenomenologically it appeared similar to some of

13   the no EEG change events.").

14          The Commissioner argues that although plaintiff has self-reported her seizures, "she has

15   not satisfied the requirement that someone else, preferably a medical professional, provide[] a

16   detailed description of her seizures." Dkt. 15, at 6 (citing 20 C.F.R. pt. 404, subpt. P, app. 1,

17   Listing 11.00H2). This is inaccurate. In May 2022, plaintiff underwent surgery to allow for

18   invasive stereo EEG monitoring that involved a hole being bored into her skull and the insertion

19   of electrodes. Tr. 748. "A number of events were recorded, and based upon the findings available

20   and the review of all the clinical and electrographic, neuroimaging data, it is clear that her

21   seizures originate from the left hemisphere, though precise ictal onset remains poorly localized."

22   *Id.* It is for this reason that the recommendation, taken up by plaintiff, was for the insertion of

23   vagus nerve stimulation ("VNS"). *Id.* During EEG monitoring in November 2021, plaintiff had

ORDER REVERSING AND REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS - 5

two complex partial seizures, one of over 13 minutes and another of over 5 minutes, which manifested with eyes closed, an appearance of being frightened, weeping, hyperventilation, tachycardia, and being partially responsive. Tr. 515. The seizure onset was from the left hemisphere but poorly localized. *Id.*

Put simply, plaintiff's history of seizures is well-documented by herself, witnesses, physicians, and monitoring equipment. The record should, however, be further developed as to whether and when during the relevant period plaintiff's epileptic seizures met or equaled Listing 11.02. Further detailed information from her treating specialist Dr. Holmes, as well as testimony by a medical expert in epilepsy, would assist in clarifying whether plaintiff's epilepsy meets Listing 11.02.[2]

### 2.  Inadequate Examination of the Medical Evidence, Plaintiff's Testimony, and Frontal Subcortical Dysfunction

Plaintiff is correct the ALJ failed to support his decision with substantial evidence with respect to examining the medical evidence, plaintiff's testimony, and the severe impairment of frontal subcortical dysfunction. Nonetheless, the Court exercises its discretion to remand for further administrative proceedings because "there is conflicting evidence, and not all essential factual issues have been resolved." *Treichler.*, 775 F.3d at 1101.

### A.  Medical Evidence

As the Commissioner concedes, this case should be remanded for further administrative proceedings because, without explanation, the ALJ declined to examine the November 2021 and February 2022 opinions by treating epilepsy specialist Dr. Holmes even though the primary

---

[2] Plaintiff asserts that plaintiff's non-exertional limitations also meet or equal Listings 12.04 and 12.06. Dkt. 9, at 13. On remand, the ALJ should reevaluate *all* asserted, relevant listed impairments.

ORDER REVERSING AND REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS - 6

1    question at issue is whether epilepsy and its sequelae render plaintiff disabled, whether via

2    Listing 11.02 or an RFC that precludes her from working fulltime. *See* Tr. 492–94, 1495. There

3    is no reasonable justification for this omission. Although Dr. Holmes credibly concluded

4    plaintiff's seizures rendered plaintiff unable to work fulltime, the record, while supportive of this

5    position, has not been adequately reviewed. Plaintiff should not, of course, be penalized for

6    seeking to return to work and asking whether she might do so on a part-time basis, such as two

7    days a week. Tr. 1514. Nonetheless, Dr. Holmes approved plaintiff's return to work at least part-

8    time "as long as you follow seizure precautions" such as "no driving within 6 months of last

9    seizure, no working at heights, no working around open flames or bodies of water, best to avoid

10    swimming unless you are with someone and wear a life jacket." Tr. 1513; *see also* Tr. 1525

11    (plaintiff asking nurse whether "you think that I should go back to work" and the nurse

12    responding "If you feel safe to work and following seizure precautions, it may be okay to resume

13    working"). It is such statements that the state agency reviewing physicians seized upon to

14    suggest that plaintiff's ability to work was limited only by seizure precautions. *See, e.g.*, Tr. 103–

15    04.

16            On remand, the ALJ should not, as the ALJ did here, cherry pick the record for aspects

17    unfavorable to plaintiff while disregarding any aspect supporting the severity of plaintiff's

18    symptoms. For example, while the regulations provide that medical opinions should be evaluated

19    primarily for supportability and consistency, 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2), (c)

20    (2017), the ALJ chose to discount the opinion of psychiatrist Scott Alvord, Psy.D., because the

21    limitations were "based on a one-time examination and not entirely consistent with the overall

22    mental health evidence." Tr. 26. That reasoning was flawed for several reasons. First, the ALJ

23    ignored the supportability of Dr. Alvord's opinion altogether. Second, the ALJ never specified

ORDER REVERSING AND REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS - 7

1    which medical opinions or evidence contradicted Dr. Alvord's opinion, and why the plaintiff

2    being "sometimes" anxious during the interview, "sometimes" having panic attacks, and

3    "overall" having her depression be well-controlled undermined the opinion that "[p]aramount is

4    her seizure disorder but certainly neurocognitive concerns as well as underlying mood symptoms

5    in the form of depression and anxiety/panic are contributory/add insult to injury." *Compare* Tr.

6    26 *with* Tr. 756. Third, it makes little logical sense for the ALJ to discount Dr. Alvord's opinion

7    on the basis of being a one-time examination while rejecting the opinion of treating epilepsy

8    specialist Dr. Holmes and accepting uncritically the opinions of non-examining state agency

9    consultants. Fourth, the ALJ was incorrect to state Dr. Alvord "did not provide specific

10   functional limits," Tr. 26, when Dr. Alvord opined in the section entitled "FUNCTIONAL

11   ASSESSMENT" that plaintiff would have moderate to marked difficulty understanding, carrying

12   out, and remembering instructions (both complex and one-to-two step); moderate to marked

13   difficulty sustaining concentration and persisting in work related activity at a reasonable pace;

14   and moderate difficulty dealing with normal pressures in a competitive work setting," Tr. 756.

15         Similarly, nothing in the ALJ's evaluation of the only opinion by Dr. Holmes that was

16   examined lends confidence that it was adequately evaluated for supportability and consistency.

17   The ALJ rejected Dr. Holmes's January 2023 opinion that work might cause plaintiff's condition

18   to deteriorate, she could miss one to four days of work per month, and would need to lie down

19   during the day on the basis that VNS placement had improved seizure activities and the seizures

20   "were not often and they did not involve the claimant losing consciousness." Tr. 26. Such

21   reasoning, without reference to specific examples, mischaracterizes the record. Although

22   plaintiff had surgery to place the VNS in January 2022, in January to February 2023, plaintiff

23   started having seizures multiple times per day that did not alter her consciousness but caused

entire body shaking, extreme weakness, and exhaustion. Tr. 928, 1669, 1671. Although she

improved to one seizure per month in May 2023, Tr. 1006, she was assaulted and punched in the

head multiple times in the head around July 2023, Tr. 807. In August 2023, plaintiff had episodes

of clusters of body shaking without loss of awareness, which appeared to be focal seizures

lasting 30 to 60 seconds, and led to Dr. Holmes ordering a new brain MRI scan and a video EEG.

Tr. 985.

       The ALJ did not support his decision to discount medical evidence favorable to plaintiff

with substantial evidence. On remand, the ALJ should reexamine the medical evidence and pay

particular attention to plaintiff's epileptic seizures, their sequelae, and other non-exertional

limitations.

## B.  Plaintiff's Testimony

       The ALJ failed to cite specific, clear and convincing reasons for discounting plaintiff's

testimony, most conspicuously regarding the nature and frequency of her seizure activity.

*Garrison*, 759 F.3d at 1014–15. Aside from conclusory statements from non-examining state

agency consultants that plaintiff's seizures were not severe enough to meet or equal a listing, *see,*

*e.g.*, Tr. 104, no physician or medical provider has suggested plaintiff's account of her seizures,

supported by witnessed seizures and EEG readings, has been unreliable. This is, of course, borne

out by plaintiff's treatment with anti-seizure medications since the age of five, invasive brain

surgery to implant electrodes, and the placement of a VNS to help mitigate the symptoms. As

plaintiff notes, the ALJ did not independently discuss the Commissioner's *post hoc*

rationalizations that plaintiff's allegations were discounted based on modest exam findings, the

medical evidence, and her daily activities. Dkt. 16, at 4–5. On remand, the ALJ should fill this

void by evaluating plaintiff's testimony with reference to record evidence.

ORDER REVERSING AND REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS - 9

### C.  Severe Impairment of Frontal Subcortical Dysfunction

The ALJ erred by failing to assess whether plaintiff's frontal subcortical dysfunction was a severe impairment at step two of the sequential evaluation. Neuroscientist Michelle Kim, Ph.D., conducted a clinical interview, reviewed prior EEG and MRI findings, administered a battery of tests, and diagnosed frontal subcortical dysfunction. Tr. 516–21. Dr. Kim noted moderate impairment on the grooved pegboard test and noted moderate impairment of fine motor speed and dexterity bilaterally. Tr. 519. Similarly, Dr. Alvord provisionally diagnosed an unspecified neurocognitive disorder. Tr. 756. On remand, the ALJ should evaluate whether frontal subcortical dysfunction constitutes a severe impairment.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **REVERSED** and this case is **REMANDED** for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).

On remand, the ALJ will take any necessary action to complete the administrative record—including, if necessary, expert medical testimony and supplemental medical opinions—offer plaintiff a hearing, and issue a new decision. The ALJ shall reevaluate severe impairments, which includes whether frontal subcortical dysfunction is a severe impairment, meaningfully evaluate Listing 11.02 and other listed impairments, and evaluate all relevant medical opinions and plaintiff's testimony.

DATED this 12th day of September, 2025.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge